UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ALLSTATE INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff/Counterclaim | ) | |
| Defendant, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 16-11652-JGD |
| JAMES FOUGERE, SARAH BRODY-ISBILL, | ) | |
| and A BETTER INSURANCE AGENCY, INC., | ) | |
| | ) | |
| Defendants/ | ) | |
| Counterclaimants. | ) | |

## MEMORANDUM OF DECISION AND ORDER ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

September 30, 2019

DEIN, U.S.M.J.

### I. INTRODUCTION

The plaintiff, Allstate Insurance Company ("Allstate"), has brought this action against its

former Exclusive Agents, James Fougere and Sarah Brody-Isbill, and an insurance agency

formed by Fougere, A Better Insurance Agency, Inc. ("ABIA") (collectively, "defendants").

Fougere and Brody-Isbill sold Allstate insurance pursuant to Exclusive Agency Agreements ("EA

Agreement") with Allstate. Allstate terminated their Agreements without notice, allegedly for

cause. Allstate contends that Fougere and Brody-Isbill breached their EA Agreements, and

misappropriated confidential and trade secret information, by failing to return customer

information and thereafter using that information at ABIA. While Allstate's objections to the

defendants' actions are far-ranging, for purposes of the pending motions, Allstate focuses its

arguments on two spreadsheets, known as "TU Framingham" and "TU Auburn," and the information contained therein, including the names of thousands of Allstate customers along with their renewal dates, premiums, types of insurance, Allstate policy numbers, drivers' license numbers, home addresses, phone numbers, and email addresses. For their part, the defendants contend that Fougere created the spreadsheets, and that the information was theirs to take and use both as a matter of contract and statute. In addition, the defendants contend that they were statutorily entitled to 180 days notice prior to their terminations.

This matter is presently before the court on "Plaintiff's Motion for Summary Judgment" (Docket No. 130) and "Defendants/Counterclaimants' Motion for Partial Summary Judgment." (Docket No. 126). Allstate has brought an 11 count Amended Complaint against the defendants (Docket No. 11), and the parties have filed cross-motions for summary judgment on seven of those counts alleging breach of contract (Counts I & V) and misappropriation of trade secrets (Counts II & VI) by Fougere and Brody-Isbill, and violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1839 et seq. ("DTSA") by each of the defendants. (Counts III,VII & IX).[1] The defendants have filed a Counterclaim (Docket No. 22), alleging breach of covenant of good faith and fair dealing (Count I) and violation of Mass. Gen. Laws ch. 175, § 163 (Count II) for failure to give statutory notice prior to terminating the EA Agreements, and violation of Mass. Gen. Laws ch. 175, § 162F (Count III) for claiming ownership in the client information that allegedly belongs to them pursuant to this statute. In addition, the defendants claim that Allstate

---

[1] Neither party has moved for summary judgment on Allstate's claims against Fougere, Brody-Isbill and ABIA pursuant to Mass. Gen. Laws ch. 93A (Counts IV, VIII, and X), and Allstate's claim against ABIA for tortious interference with advantageous business relations (Count XI). Consequently, these counts remain viable for trial and will not be discussed further herein.

violated Mass. Gen. Laws ch. 93A in connection with the termination of their Agreements (Count V).[2] Allstate has moved for summary judgment on all of these counterclaims, while the defendants have moved for summary judgment on the claim under ch. 175, § 163.

In connection with the motion for summary judgment, the defendants have moved to strike several paragraphs of an affidavit submitted by plaintiff's counsel, and to disqualify plaintiff's counsel. (Docket Nos. 150, 151). Plaintiff has countered with a motion for sanctions. (Docket No. 161).

After careful consideration of the very complex record, and the parties' written and oral arguments, and for the reasons detailed herein, this court rules as follows:

1.      Defendants' motion to strike (Docket No. 150) is ALLOWED, defendants' motion to disqualify (Docket No. 151) is DENIED and plaintiff's motion for sanctions (Docket No. 161) is DENIED. In addition, the court will not consider the email purportedly obtained from counsel for the Massachusetts Division of Insurance and related arguments.

2.      With respect to the Counterclaim, neither Mass. Gen. Laws ch. 175, § 163 nor ch. 175, § 162F apply to the defendants as Exclusive Agents of Allstate, so Allstate's motion for summary judgment is ALLOWED on Counts I, II and III of the Counterclaim, and defendants' motion for summary judgment on Count II of the Counterclaim is DENIED.

The court finds further that it is questionable that Mass. Gen. Laws ch. 93A applies to the parties' contractual arrangement, but for reasons different than those argued by the parties. Therefore, the plaintiff's motion for summary judgment on Count V of the

---

[2] The defendants voluntarily withdrew their counterclaim for wrongful interference with contractual relations (Count IV) prior to the motions for summary judgment, so that claim is not discussed herein.

Counterclaim is DENIED WITHOUT PREJUDICE. The court will allow the plaintiff to move for summary judgment on this claim again, if it believes it to be warranted.

3.      With respect to Allstate's claims, this court finds that the TU Framingham and TU Auburn spreadsheets, and the information contained therein, are confidential and trade secret information belonging to Allstate. This court finds further that Fougere and Brody-Isbill breached their contract by failing to return this information to Allstate, and by using this information at ABIA, and misappropriated Allstate's trade secrets for the same reasons. However, the extent of such use after the termination of the EA Agreements and the extent of damages, if any, are in dispute. Therefore, Allstate's motion for summary judgment as to Counts I, II, III, V, VI, VII, and IX IS ALLOWED AS TO LIABILITY ONLY, and the defendants' cross-motion as to those Counts is DENIED. This ruling is limited to the TU Framingham and TU Auburn spreadsheets and the information contained therein.

## II.  <u>STATEMENT OF FACTS</u>[3]

The parties' statements of fact, and responses thereto, include many allegations that are extraneous to the issues before the court in connection with the cross-motions for summary judgment, and are very argumentative. This court has carefully scrutinized the

---

[3] Unless otherwise indicated, the facts are derived from Defendants' Statement of Material Facts in Support of Their Motion for Partial Summary Judgment (Docket No. 128) ("DF __"); and the exhibits attached to the Defendants' Memorandum in Support of their Motion for Partial Summary Judgment (Docket Nos. 127, 135) ("DEx. __"); Plaintiff's Response to Defendants' Statement of Material Facts (Docket No. 143) ("PR __"); and the exhibits attached thereto ("PREx. __"); Plaintiff's Statement of Material Facts in Support of its Motion for Partial Summary Judgment (Docket Nos. 132, 143) ("PF __"); and the exhibits attached thereto ("PEx. __"); Defendants' Responses to Plaintiff's Statement of Material Facts (Docket Nos. 138, 148) ("DR __"); and the exhibits attached thereto ("DREx. __"). This court notes that by citing to deposition pages instead of the Statements of Fact in their memoranda, the defendants have made it much more difficult to determine whether assertions of fact are contested.

pleadings to determine if the facts alleged are actually material to the issues this court must decide, and, if so, the scope of the alleged disputes and whether the disputes are genuine or merely form over substance. The following recitation of facts reflects this court's best effort to distill the record to relevant facts, and they are undisputed unless otherwise indicated.

## Formation of Relationship between Fougere and Allstate

Allstate is in the business of providing insurance and other financial products and services to individuals and businesses. (PF ¶ 1). In or about 2009, Allstate began selling auto and causality insurance in Massachusetts through its call centers and agents in neighboring states. (PR ¶ 1). Three years later, in 2012, Allstate began to open "brick and mortar" locations in Massachusetts. (Id.).

Defendant Fougere began his insurance career with Liberty Mutual in 2010. (DEx. 3 at 37, 38). He continued to work as a licensed insurance agent with Liberty Mutual until he left to manage another insurance agency, the defendant A Better Insurance Agency ("ABIA"). (DF ¶ 6; PR ¶ 6). ABIA was formed on June 29, 2012 by Fougere's mother, Donna Fougere, who retained a 100 percent ownership interest in the company. (PF ¶¶ 43, 44; PEx. K). At the time ABIA was incorporated, Donna Fougere was working full time as a nurse and had no prior experience in the insurance industry. (PF ¶ 45). The parties dispute the extent to which Donna Fougere was involved with ABIA. (See DR ¶¶ 45-47; PR ¶ 6). It is undisputed, however, that Fougere managed ABIA before becoming affiliated with Allstate. (PR ¶ 6).

On or about February 1, 2013, Fougere became an Exclusive Agent for Allstate. (PR ¶ 7).

As such, he entered into an Exclusive Agency Agreement with Allstate[4] and began operating an Allstate agency under the name Local Agents, Inc. (PF ¶ 20; DR ¶ 20).[5] It is undisputed that Fougere was an independent contractor under the terms of the Agreement. (EA Agreement ¶ I.D).

Fougere was a "scratch" insurance agent. (PR ¶ 7). As such, Fougere was not provided with existing Allstate customers or accounts when he began working for Allstate. (Id.). Instead, he was tasked with soliciting new clients for the company. (Id.). Fougere's obligation to develop business was reflected in the EA Agreement as follows:

> Agency will meet certain business objectives established by the Company in the areas of profitability, growth, retention, customer satisfaction and customer service. *Agency will build and maintain a profitable book of business,* assist the Company in its efforts to achieve market penetration for all forms of insurance offered by the Company and other Company Business, and service the Company's customers in a manner consistent with the Company's goodwill, reputation, and overall business strategy.

(EA Agreement ¶ II.B (emphasis added)).

As detailed more fully below, the defendants contend that the customer information they gathered belonged to them, while Allstate contends that it belongs to Allstate. This court agrees with Allstate. The EA Agreement defines "confidential information" in part as including "information regarding the names, addresses, and ages of policyholders of the Company; types of policies; amounts of insurance; premium amounts; . . . the expiration or renewal dates of

---

[4] A copy of Fougere's Exclusive Agency Agreement is found at PEx. C. A copy of Brody-Isbill's Exclusive Agency Agreement is found at PEx. D. They are identical in all material respects so the court will just cite to "EA Agreement."

[5] Pursuant to the EA Agreement, Allstate is the "Company," Local Agents, Inc. is the "Agency" and Fougere is the "Key Person." The defendants make no distinction between Fougere and Local Agents, Inc. for purposes of the issues raised by the summary judgment motions, so for convenience the court will refer to Fougere or the defendants.

policies; policyholder listings and any policyholder information subject to any privacy law[.]" (Id. ¶ IV.D).  It further provides that "[a]ll such confidential information is wholly owned by the Company" and "may be used by Agency only for the purposes of carrying out the provisions of this Agreement."  (Id.).  Upon termination of the Agreement, the Agency was obligated to continue to treat the information as confidential (id. ¶ IV.B) and to return to Allstate all confidential information (id. ¶ XVIII.B), which included confidential information "recorded on paper, electronic data file, or other medium, whether provided by the Company or the Agency[.]"  (Id. ¶ IV.E).  For the reasons detailed below, this court concludes that the defendants' retention of such customer information and the transfer of that information to ABIA following the termination of the EA Agreements constitute a breach of contract and misappropriation of trade secrets.

Fougere hired several employees to work at Local Agents, including his longtime girlfriend, Joanne Brody, and her daughter, Sarah Brody-Isbill.  (See DR ¶ 33; PF 22).  Defendant Brody-Isbill became a licensed insurance agent in Massachusetts that same year.  (DR ¶ 33).  The defendants assert, but the plaintiff denies, that Fougere was encouraged to transfer existing clients to Allstate and that Exclusive Agents were permitted, and even encouraged, to sell products from other carriers.  (DR ¶¶ 2-3; PR ¶ 7).  The EA Agreement provides, as detailed more fully below, that the "Agency will not, either directly or indirectly, solicit, sell, or service insurance of any kind for any other company, agent, or broker, or refer a prospect to another company, agent, or broker, without the prior written approval of the Company."  (EA Agreement ¶ I.E).  The Contractor Manual, which is part of the EA Agreement (see id. ¶ I.C), provides that as an Exclusive Agent "you may not directly or indirectly solicit, sell or service insurance of

any kind for any other company without prior written approval from the Company. . . . Any involvement in an independent agency's business operation would be prohibited as it would constitute indirect soliciting, selling, or servicing insurance[.]" (PEx. OO at 10). Finally, the EA Agreement provides that "[f]or a period of one year following termination" of the Agreement, neither the Agency nor the Key Person were to "solicit the purchase of products or services in competition with those sold by the Company." (EA Agreement ¶ XVIII.D).

Fougere operated his Allstate agency out of a location in Framingham, Massachusetts. (PF ¶ 21). At least initially, Allstate seemed pleased with his performance: he received a number of sales awards for his high levels of production and was placed on Allstate's Regional Advisory Board. (See PR ¶¶ 13, 14). Nevertheless, during the course of his operation as an Exclusive Agent for Allstate, Fougere contends that he "identified and brought to the attention of management at Allstate numerous violations of Massachusetts insurance laws and regula-tions[,]" which Allstate strenuously denies. (See DF ¶ 15; PR ¶ 15). It is Fougere's contention that it was his conduct in reporting such violations that was the true reason his EA Agreement was terminated.

### Formation of Relationship between Brody-Isbill and Allstate

Despite an admitted lack of experience, in 2014 Brody-Isbill applied, and was accepted into the EA training program.[6] (PF ¶ 37). She underwent training, although she denies that it included any training about keeping customer information confidential. (See PF ¶ 5; DR ¶ 5). Around the time of the training, on April 1, 2014, Brody-Isbill entered into an Exclusive Agency

---

[6] The parties dispute whether this was done to circumvent Allstate's position that Fougere could not yet open another agency, or due to Brody-Isbill's own interest in owning an agency. (See PF ¶¶ 31-36; DR ¶¶ 31-36). That issue does not need to be resolved here.

Agreement with Allstate and opened up an Allstate office in Auburn, Massachusetts.[7] (See DF ¶ 16; PEx D; DR ¶ 38). The defendants contend that Brody-Isbill did not read the EA Agreement before signing it, because she was told she would have a chance to review it later. (DF ¶ 17). In fact, Brody-Isbill contends that she never read the EA Agreement. (PR ¶ 17).

### Events Leading to the Termination of the EA Agreements

On August 29, 2014, two new entities were formed using the address 1661 Worcester Road, Framingham, Massachusetts: Thumbs Up Marketing, Inc. ("Thumbs Up") and Awesome Agents, Inc. ("Awesome Agents"), an insurance agency. (PF ¶ 79; see DR ¶¶ 80-83). Fougere claims that Thumbs Up was a marketing company that bought and sold leads. (DF ¶ 8). Allstate disputes this, claiming that it was another insurance agency.[8] (PR ¶ 8). Fougere was listed as the owner of Thumbs Up and Joanne Brody was the owner of Awesome Agents. (DR ¶¶ 80-81). It is Allstate's contention that the defendants, unbeknownst to Allstate, were operating ABIA, Thumbs Up, Awesome Agents and the Allstate offices as a single group – transferring customers and referrals among themselves and improperly sharing Allstate's customer information. (See PF ¶¶ 50-57, 82-83). The defendants deny this, and assert that the common link was Thumbs Up, which "directed leads to the different agencies and they would receive them basically on a queue system." (DR ¶ 51). Since much of this conduct goes beyond the scope of the summary judgment motions, it will not be explored in detail further.

---

[7] Under Brody-Isbill's EA Agreement, she was the Key Person and the Agency was Worcester County Agents, Inc. (PEx. D). Again, the defendants make no distinction between Brody-Isbill and her company, so this court will not either.

[8] The former marketing manager at Thumbs Up, Inna Tunik, described Thumbs Up as "a small independent insurance agency" on her LinkedIn profile. (PEx. Z at 2).

In September of 2014, an Allstate employee working under Fougere, Adam Kozerski, emailed Allstate about what he viewed to be troubling agency practices, including, without limitation, the co-mingling of business between Fougere's and Brody-Isbill's Allstate agencies. (See PF ¶¶ 58-59; PEx. S).  Allstate contends that it launched an investigation in response to the email, and that practices were discovered which gave the Company grounds to terminate Fougere's EA Agreement for cause, and without notice.  (See PF ¶¶ 61-69; PEx. J)  Allstate terminated Fougere's EA Agreement on November 19, 2014 without notice.  (PF ¶ 69).  It also cut off his access to Allstate's online electronic records portal and collected any physical files in Fougere's Allstate agency office.  (Id. ¶ 70).  The merits of the termination are not at issue in connection with the motions for summary judgment, other than the defendants' contention that they were not afforded the notice and other rights provided by statute.  Suffice it to say that the defendants dispute everything related to Allstate's decision to terminate, including whether the termination was based on the findings of Allstate's investigation.  (See DR ¶ 69).  It is undisputed, however, that after the termination of his EA Agreement, Fougere assumed the title of "sales manager" at ABIA.  (PF ¶ 85).

Allstate did not terminate Brody-Isbill's EA Agreement at the same time as Fougere's. Instead, according to Allstate, but denied by the defendants, she was cautioned not to allow Fougere to have any role in the operation of her agency, and she was advised about unacceptable business practices.  (See PF ¶¶ 72-74; DR ¶¶ 72-74).  According to Allstate, but again denied by the defendants, Brody-Isbill's compliance issues continued.  (PF ¶ 75; DR ¶ 75). It is undisputed that Allstate terminated Brody-Isbill's EA Agreement on October 5, 2015, effective immediately.  (PF ¶ 76).  Her access to Allstate's electronic records portal was

terminated and Allstate collected the physical files in her Allstate office.  (PF ¶ 77).  Again, as

the merits of the termination decision are not at issue in these summary judgment motions, the

facts will not be discussed further herein.

## Use of Allstate Customer Information

It is Allstate's contention that the defendants repeatedly used its customer information

for their other businesses, including ABIA and Thumbs Up.  In support of this contention,

Allstate points to the following memoranda, which are not disputed, and which Allstate

contends it discovered during its own internal investigations.  Thus, on July 26, 2014, Fougere

sent an email to Brody-Isbill, Joanne Brody and Bruce Walker (ABIA's sales manager) attaching a

spreadsheet which included the names, Allstate policy numbers, renewal dates, premiums,

names, addresses and phone numbers of Allstate customers.  (PF ¶ 55-56).  On March 25, 2015,

while Brody-Isbill was still an Allstate Exclusive Agent, a Thumbs Up employee circulated a

memorandum about generating sales leads.  (PF ¶¶ 86-87; PEx. AA).  The memorandum

instructed employees to transfer sales leads to Auburn sales agents (i.e., Brody-Isbill's agency),

and if Auburn was unsuccessful, then to ABIA sales agents.  (Id.).  The email also states that

"phase two" of the strategy was to use "Allstate Book of Business" to generate leads.  (Id.).  On

April 3, 2015, Thumbs Up employee Inna Tunik emailed Joanna Brody at her Awesome Agents

email address, copying Fougere, and referenced the use of "Allstate – X date/Requote"[9] and

"James's Customer List" as potential sources of leads.  (PF ¶ 88; PEx. BB).  On July 20, 2015,

Tunik again emailed Fougere at his ABIA address and Joanne Brody regarding "reports for the

_____

[9] "X date" refers to the renewal date of a customer's insurance policy.  (PF ¶ 89).  Agents generally reach
out to potential customers approximately thirty days before the customer's renewal date as that is
when the customer is most likely to consider a change in their policy.  (Id.).

previous week." (PF ¶ 91; PEx. DD). The reports referenced the "Allstate Customer List – Framingham" as a source for leads. (Id.)

### Discovery of the Spreadsheets

As noted above, Brody-Isbill's EA Agreement was terminated by Allstate on October 5, 2015. (PF ¶ 76). On November 11, 2015, Allstate's attorney sent a letter to Fougere's attorney stating that Allstate had "reason to believe that Fougere still possesses Allstate confidential information and, even more disturbing, has already used this information to solicit Allstate customers on behalf of his insurance agency, 'A Better Insurance Agency.'" (PF ¶ 92; PEx. EE). The letter requested written assurance from Fougere's counsel that Fougere did not possess and was not using Allstate confidential information, as defined in his EA agreement. (PEx. EE). On January 11, 2016, Fougere's counsel replied in writing to Allstate's attorney that "Fougere has not utilized any customer lists or confidential information of Allstate to solicit clients." (PF ¶ 93; PEx. FF). Additionally, the letter assured Allstate that Fougere would "continue to respect and not disclose any confidential information of Allstate[.]" (PEx. FF).

On July 20, 2016, three former employees[10] of ABIA emailed plaintiff's counsel. (PF ¶ 94; PEx. GG). The email, sent under a fake name, claimed that Fougere "has over 5,000 customers on a list with all their information and phone numbers from [A]llstate," and that Fougere "has his agents call out to these customers[.]" (PEx. GG). In subsequent conversations,

---

[10] The three employees were: (1) Kevin Gabbet, employed by ABIA from February 8, 2016 to July 14, 2016; (2) Jonathan Anderson, employed by ABIA from May 9, 2016 to June 30, 2016; and (3) Brian Plain, employed by ABIA from March 28, 2016 to July 14, 2016. (PEx. HH). These three employees left ABIA and started their own insurance agency — Premier Shield. (Docket No. 147 Ex. 32 at 26). Their new firm subsequently settled a separate lawsuit with ABIA. (Id. at 28).

and as detailed in affidavits provided in this litigation, these former employees of ABIA repre-sented that Fougere had given them access to files labeled "Framingham Allstate book of business" and "Allstate Auburn book of business," contained on a restricted Google Drive, which included the "names, addresses, phone numbers, email addresses, renewal dates, types of insurance policies, and premiums paid by insurance customers." (PF ¶ 95; PEx. HH ¶¶ 7-9).[11] According to the former employees, Fougere represented, in Brody-Isbill's presence, that these were files that they had retained from their former Allstate insurance agencies. (PEx. HH ¶ 10). Further, they claimed that Fougere instructed them and other ABIA employees to solicit the customers contained within those spreadsheets. (PF ¶ 96; PEx. HH ¶¶ 10-11). The former employees further attested that ABIA routinely received messages addressed to Allstate, and solicited customers identified in those messages. (PEx. HH ¶¶ 13-14). They also claimed that, although they did not witness Brody-Isbill actively solicit clients on behalf of ABIA, she did issue insurance policies on ABIA's behalf and used a fake name when speaking to customers. (Id. ¶¶ 5-6). The defendants "dispute the truthfulness of the statements" made by the former employees, without explanation, and argue that Allstate's counsel drafted the affidavits. (See, e.g., DR ¶ 96).

The former employees also forwarded portions of the referenced "Framingham Allstate" book of business and "Allstate Auburn" book of business to Allstate's counsel. (PEx. HH ¶ 16; see Docket No. 30 at ¶ 3). The lists contained the names, customers' addresses, Allstate policy numbers, phone numbers, types of insurance coverage, premiums and renewal

---

[11] Paragraph references herein are to the affidavit of Kevin Gabbett, the first affidavit in PEx. HH.

dates.  (See PF ¶ 95).

Suit was filed on August 15, 2016.  A court ordered forensic examination of ABIA's computers revealed spreadsheets entitled "Allstate-Auburn" and "Allstate-Framingham" in the trash folder of the computer.  (See Docket No. 62 at 2).  Additional customer lists entitled "TU Framingham" and "TU Auburn" were also located, and Allstate was permitted to take four screen shots of these spreadsheets pending a forensic examination by an independent examiner.  (Docket No. 46).  By the time the forensic examination was able to be conducted (following much motion practice), the Allstate-Auburn and Allstate-Framingham folders had been permanently deleted.  (Docket No. 62 at 8).   It is unclear from the present record whether the two sets of documents are just duplicates or if there are four distinct lists.

In any event, Allstate compared screenshots of the TU Framingham and TU Auburn lists to its audits of Fougere's and Brody-Isbill's book of business, and found that 34 of the 35 names in the Thumbs Up (TU) Framingham list were Allstate customers assigned to Fougere's agency at the time of his termination (PF ¶¶ 99, 100), and that 22 of the 29 customers in the Thumbs Up (TU) Auburn list were Allstate customers assigned to Brody-Isbill's agency.  (PF ¶¶101-102). While the defendants question the validity of the audit, they have not put forth any affirmative evidence that Allstate's comparisons were inaccurate.

Apart from asserting that "persons on the list are not all current customers of Allstate" the defendants admit that the following is true:

> The "Thumbs Up Framingham" and "Thumbs Up Auburn" spreadsheets produced by Defendants Fougere and Brody-Isbill each contain the names of thousands of Allstate customers, along with their renewal dates, premiums, types of insurance, Allstate policy numbers, drivers' license numbers, home addresses, phone numbers and email addresses.

[14]

(PF ¶ 103; DR ¶ 103).

Fougere contends that Thumbs Up compiled the lists before, during, and after he was an Allstate agent.  (DF ¶ 33; PR ¶ 33).  Fougere claims that he derived the information from third party sources such as car dealerships, real estate agents, lead providers, and the RMV.  (DF ¶ 32).  In support of this assertion, Fougere has belatedly produced in connection with the summary judgment briefing documents he contends demonstrate that he purchased the client information from third-party sources.  (See Docket No. 147 Ex. 31).  Allstate points out, however, that none of these documents refer to Thumbs Up, some appear to have been generated after suit was filed, and there is no indication in these purported invoices explaining what they are for.  (See Docket No. 160 at 5-8).  Moreover, it is undisputed that there is no one source from where all the information in the spreadsheets can be obtained.

Additional factual details relevant to the court's analysis shall be described below where appropriate.

### III.   ANALYSIS – DEFENDANTS' MOTIONS TO STRIKE AND DISQUALIFY; PLAINTIFF'S MOTION FOR SANCTIONS

As an initial matter, this court will address the defendants' motion to strike (Docket No. 150) and motion to disqualify (Docket No. 151), as well as the plaintiff's motion for sanctions. (Docket No. 161).  The basis for these motions is a series of interactions between the parties and Edward Phelan, Counsel for the Massachusetts Division of Insurance.  As this court ruled at oral argument, the court will not consider the challenged communication or the related legal arguments.  The basis for the court's ruling is explained herein.

It appears that in October 2016, defendant Fougere contacted the Massachusetts Division of Insurance inquiring about whether Mass. Gen. Laws ch. 175, § 163 applies to "exclusive agents if they are not employees." (See DEx. 21). Phelan responded to Fougere's inquiry via email. (Id.). The plaintiff contends that this email was not produced during discovery, and the defendants have not produced any evidence to the contrary.[12] (See Docket No. 161 at 3). Despite this, defense counsel, Timothy Cutler, quoted Phelan in support of defendants' legal argument about the applicability of Mass. Gen. Laws ch. 175, § 163 in the defendants' memorandum in support of their motion for partial summary judgment. (See Docket No. 127 at 39). The defendants attached a redacted version of the email as an exhibit. (See DEx. 21).

Plaintiff's counsel, Kevin Mahoney, subsequently called Phelan after learning that the defendants were relying on Phelan's email in support of their motion. (PREx. DD ¶ 3). Mr. Mahoney then included an affidavit relaying the substance of this telephone conversation as an exhibit to the plaintiff's responses to the defendants' statement of undisputed facts. (Id.).

Defendants now seek to strike two paragraphs from Mr. Mahoney's affidavit and to disqualify the averring attorney from working on this case. In particular, defendants are seeking to strike paragraphs 4 and 5 of Attorney Mahoney's affidavit, which provide as follows:

> 4. Mr. Phelan further stated that his email should not to [sic] be construed as an official policy statement of the Massachusetts Division of Insurance.

---

[12] In a strident letter to plaintiff's counsel, defense counsel asserted that the email was referenced in the defendants' Initial and Supplemental Disclosures. (See Docket No. 161-1 at 1). This court has reviewed these Disclosures and has not located any reference to the email in question. (See Docket No. 26 at 10-12; Docket No. 161-2 at 12-13). The defendants have not submitted any Bates-stamped or other copy of the email which would indicate that it had been produced during discovery.

5.  Mr. Phelan further stated that the only official interpretation of the statute addressed in his email would be promulgated by the Massachusetts Division of Insurance and that, to the best of his knowledge, the Division of Insurance has never published any official guideline on the interpretation of that statute.

Defense counsel argues that the affidavit's references to statements made by Phelan constitute inadmissible hearsay.  He further contends that plaintiff's counsel has violated Massachusetts Rules of Professional Conduct Rule 3.7 by "affirmatively interject[ing] himself into the proceedings as a witness."  (Docket No. 151 at 1).  The plaintiff counters that these motions were made in bad faith, and has moved for sanctions under Fed. R. Civ. P. 11 and seeks attorneys' fees.

As this court stated at the hearing on the present motions held on May 6, 2019, Mr. Mahoney's affidavit and Fougere's email correspondence with Edward Phelan both constitute inadmissible hearsay.  Each of these exhibits contains out-of-court statements by Phelan that have been offered substantively on the issue of the defendants' Mass. Gen. Laws ch. 175, § 163 claim.  See Fed. R. Evid. 802.  Accordingly, while the motion to strike is ALLOWED, this court also will not consider Phelan's email (DEx. 21) or the related legal arguments.

There is no basis for disqualifying plaintiff's counsel as a result of these events.  As an initial matter, given that defendants produced the email for the first time in connection with the summary judgment pleadings, and did not give the plaintiff the opportunity to explore the significance of Phelan's comments during discovery, Mr. Cutler should not be surprised that the plaintiff felt the need to follow up with Phelan outside of formal discovery and in an expedited

manner as part of the summary judgment record.  Moreover, this court does not find a viola-

tion of Massachusetts Rules of Professional Conduct Rule 3.7.[13]  As that Rule provides, in

relevant part:

> (a)  A lawyer shall not act as advocate at a trial in which the lawyer is likely
> to be a necessary witness unless:
>
> > (1)  the testimony relates to an uncontested issue;
> >
> > (2)  the testimony relates to the nature and value of legal services
> > rendered in the case; or
> >
> > (3)  disqualification of the lawyer would work substantial hardship on
> > the client.

Mass. Rules of Prof'l Conduct R. 3.7.  "The party moving for disqualification of a lawyer under

Rule 3.7 has the burden of showing that the lawyer is likely to be a necessary witness by

demonstrating that the lawyer's testimony is relevant to disputed, material questions of fact

and that there is no other evidence available to provide those facts."  Carta v. Lumbermens

Mut. Cas. Co., 419 F. Supp. 2d 23, 29 (D. Mass. 2006) (citation omitted).  "[J]udges must

carefully examine the evidence before them and should consider whether the information

sought from the attorney-witness can be presented in a different manner, whether the

attorney-witness's testimony would be cumulative or marginally relevant, or whether

disqualification was a foreseeable outcome."  Smaland Beach Ass'n, Inc. v. Genova, 461 Mass.

214, 221, 959 N.E.2d 955, 963 (2012).  Rule 3.7 is only applicable to the conduct of counsel at

---

[13] Local Rule 83.6.1 of this court provides that attorneys practicing before this federal district court shall
be governed by the Massachusetts Rules of Professional Conduct.

trial.  See Records v. Geils Unlimited Research, LLC, No. 12-11419-FDS, 2013 WL 3967970, at *6 (D. Mass. July 30, 2013).

In the instant case, it is difficult to see how Phelan himself would be competent to testify at trial about his understanding of the meaning of a statute in the absence of an official agency interpretation.  Even assuming, arguendo, that such testimony would be admissible, defendants have not established why Mr. Mahoney's testimony would be admissible, or why it would be necessary for counsel to testify at trial about the substance of a conversation he had with Phelan.  There is no evidence from this record to establish that Mr. Mahoney is "likely to be a necessary witness at trial" and there is no basis to disqualify him.

Plaintiff's request for sanctions is a closer question.  "Fed. R. Civ. P. 11 requires that an attorney make reasonable inquiry to assure that all pleadings, motions and papers filed with the court are factually well-grounded, legally tenable and not interposed for any improper purpose."  Mariani v. Doctors Assocs. Inc., 983 F.2d 5, 7 (1st Cir. 1993).  Moreover, it is well-recognized "that disqualification motions can be tactical in nature, designed to harass opposing counsel" and that care must be taken so that opposing parties do not use motions to disqualify as "procedural weapons."  Kevlik v. Goldstein, 724 F.2d 844, 848 (1st Cir. 1984).  In the instant case, there is no merit to the motion to disqualify.  Nevertheless, it appears that Mr. Cutler acted out of a (misplaced) understanding as to the motive behind Mr. Mahoney's affidavit, and not in an effort to gain a tactical advantage.  Therefore, this court will deny the request for sanctions in an exercise of the court's discretion.

The court now turns to the parties' cross-motions for summary judgment.

# IV.  ANALYSIS –
## DEFENDANTS' COUNTERCLAIM

### A.      Standard of Review - Summary Judgment

"The role of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  PC Interiors, Ltd. v. J. Tucci Constr. Co., 794 F. Supp. 2d 274, 275 (D. Mass. 2011) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)).  The burden is upon the moving party to show, based upon the discovery and disclosure materials on file, and any affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"  Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)).  "A fact is 'material' only if it possesses the capacity to sway the outcome of the litigation under the applicable law."  Id. (quotations, punctuation and citations omitted).

"Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue."  PC Interiors, Ltd., 794 F. Supp. 2d at 275.  The opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts.  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841-42 (1st Cir. 1993).  Accordingly, "the nonmoving party 'may not rest upon mere allegation or denials of his pleading[,]'" but must set forth specific facts showing that there is a genuine issue for trial.  Id. at 841 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)).  The court affords "no evidentiary weight to conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative."  Tropigas de P.R., Inc. v. Certain Underwriters at

Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011) (internal quotation marks and citation omitted).  Rather, "[w]here, as here, the nonmovant bears the burden of proof on the disposi-tive issue, it must point to 'competent evidence' and 'specific facts' to stave off summary judgment."  Id. (citation omitted).

"Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed."  Adria Int'l Group, Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001).  "'When facing cross-motions for summary judgment, a court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56.'"  Peck v. City of Boston, 750 F. Supp. 2d 308, 312 (D. Mass. 2010) (quoting Dan Barclay, Inc. v. Stewart & Stevenson Servs., Inc., 761 F. Supp. 194, 197-98 (D. Mass. 1991)).

## B. The Defendants' Claim under Mass. Gen. Laws ch. 175, § 162F

The defendants contend that Allstate violated Mass. Gen. Laws ch. 175, § 162F.  (Docket No. 22 at 28).  The defendants explain that "[t]he significance of section 162F is that Allstate cannot claim any information obtained by defendants regarding Allstate policies or the placement of those policies because that information does not belong to Allstate, but belongs to defendants."  (Docket No. 137 at 19).  Allstate is seeking summary judgment on this Counter-claim (Count III) on the grounds that the section does not apply in the instant case.  This court agrees.

Section 162F provides, in relevant part:

A duly licensed agent ... **doing business pursuant to the so-called American agency system,** other than that of an employer to employee relationship**,**

shall own and have an exclusive right to use certain insurance information contained in insurance policies, certificates of insurance or a written memorandum of a preliminary contract of insurance issued by said agent or broker, embodying the records of an insurance agency which shall include but not be limited to the policy inception date, the amount of insurance coverage, the policy number, the name of the insurance company, the name of the insured, the amount of insurance premiums and the terms of insurance.... The provisions of this section shall apply only to property and casualty insurance.

Mass. Gen. Laws ch. 175, § 162F (emphasis added).

"The nonexhaustive list of data enumerated in the statute is consistent with the meaning of 'insurance expirations,'" that is "the data necessary to solicit renewals." Arbella Mut. Ins. Co. v. Comm'r of Ins., 456 Mass. 66, 88-89, 921 N.E.2d 537, 555-56 (2010). The "American Agency System is the term applied to the principle agreed upon generally by insurance companies and independent agents relating to the ownership of expirations. It provides that upon termination of an agency agreement, if the agent has promptly accounted for and paid over premiums for which he is liable, his records and the use and control of the expirations shall remain his property and be left in his undisputed or undisturbed possession; otherwise the records and use and control of expirations shall be vested in the company." In re Roy A. Dart Ins. Agency, 5 B.R. 207, 210 n.2 (Bankr. D. Mass. 1980). Allstate contends that this section does not apply to the defendants as they are not "doing business pursuant to the so-called American Agency System." This court agrees.

Agents or brokers operating under the American Agency System have the right to solicit business for multiple insurers. Arbella, 456 Mass. at 85, 921 N.E.2d at 553-54. "[I]n Massachusetts, an agent who does business pursuant to the American agency system is not an employee agent or an exclusive agent; such an agent is an independent producer and thus 'free to sell insurance products through more than one company.'" Id. at 90, 921 N.E.2d at 557 (quoting

Nationwide Mut. Ins. Co. v. Comm'r of Ins., 397 Mass. 416, 418, 491 N.E.2d 1061, 1063 (1986)).

Where, however, the agent is obligated to solicit business for only one insurer, the expirations

are owned by the company.  See In re Roger G. Gibson, Case No. 3:15-bk-5172-JAF, 2017 WL

7795950, at *7 (Bankr. M.D. Fla. June 22, 2017) (distinguishing independent insurance agent,

"who normally represents contemporaneously several insurers," and agent who is soliciting

insurance "on behalf of any particular insurance company[.]").

In the instant case, this court finds that despite the defendants' conclusory protesta-

tions to the contrary, the material facts are not in dispute and establish that the defendants are

not operating under the American Agency System.[14]  As an initial matter, the terms of the

parties' contract controls.[15]  As the Arbella Court explained:

> The American agency system is not free standing.  It is a specialized canon
> of interpretative principles that applies to *contracts* between agents and
> insurers, resolving in agents' favor any silences or ambiguities concerning the
> ownership of insurance expirations.  It has no application outside the agency
> contract.  The purpose of the first sentence of § 162F – plain from the
> language of the statute – is to codify the interpretive presumption of the
> American agency system.

Arbella, 456 Mass. at 90-91, 921 N.E.2d at 557 (emphasis in original; footnotes omitted).  Here,

the EA Agreement makes it clear that Allstate owns the expirations and that the Agency is to

sell Allstate insurance exclusively.

---

[14]  The mere fact that the defendants were deemed independent contractors is not dispositive.
Whether an agent operates under the American Agency System or an Exclusive Agency System, they are
"regarded as independent agents, in contrast to agents who are employees of an insurance company."
Nationwide Mut. Ins. Co., 397 Mass. at 418 n.2, 491 N.E.2d at 1063 n.2.

[15] The EA Agreements expressly provide that the Agreement "supersedes any prior oral statements and
representations by the Company and any prior written statements and representations by the Company
in letters, manuals, booklets, memoranda, or any other format."  (EA Agreement ¶ I.B).

Before further discussion, this court needs to address the defendants' assertion that defendant Brody-Isbill never read the EA Agreement.  (See DR ¶ 7).  "The general rule is that, in the absence of fraud, one who signs a written agreement is bound by its terms whether [s]he reads and understands it or not."  Canney v. N.E. Tel & Tel. Co., 353 Mass. 158, 165, 228 N.E.2d 723, 728 (1967).  Here, there are no allegations or fact to support a finding that Brody-Isbill was fraudulently induced by Allstate to enter into her Agreement with the Company.  See Cohen v. Santoianni, 330 Mass. 187, 192, 112 N.E.2d 267, 271 (1953) (even despite "suspicious circumstances[,]" "[i]t is elementary that fraud is never presumed, but must be affirmatively alleged and proved by the party who relies upon it for the purpose of either attack or defense.").  Thus, the defendants are bound by the terms of their Agreements with Allstate.

As noted above, the Arbella Court has determined that the definition of confidential information in the Agreement, i.e., including "information regarding the names, addresses, and ages of policyholders of the Company; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal dates of policies . . . [,]" is the same as "expirations" which is the subject of § 162F.  Arbella, 456 Mass. at 88, 921 N.E.2d at 535-36; see also Metz v. Allstate Ins. Co., 164 Md. App. 386, 398, 883 A.2d 943, 950 (2005) (interpreting same language in Allstate EA Agreement).  In contrast to ch. 175, § 162F, the EA Agreement expressly provides that the "Company will own all business produced under the terms of this Agreement" (EA Agreement ¶ I.A); that the "confidential information is wholly owned by the Company" (id. ¶ IV.D); and that "[a]ny confidential information . . . recorded on paper, electronic data file, or any other medium, whether provided by the Company or by Agency, is the exclusive property of the Company, as is any such medium and

any copy of such medium." (Id. ¶ IV.E).  The EA Agreement also provides that upon termination, the Agency will "treat as confidential and not [ ] disclose, either directly or indirectly, to any third party any confidential information or trade secrets of the Company." (Id. ¶ IV.B).  As a result of these and other provisions, it is clear that Allstate owns the expirations; there are no "silences or ambiguities concerning the ownership of insurance expirations" to which to apply the interpretive principles of the American Agency System.  Arbella, 456 Mass. at 90-91, 921 N.E.2d at 557; see also Metz, 164 Md. App. at 403, 883 A.2d at 952-53 (under R3001, Allstate EA Agreement expirations belong to Allstate; agent was a "captive agent" who worked exclusively for Allstate and was not entitled to statutory notice protections).

Similarly, the unambiguous language of the EA Agreement provides that the Agency is not to sell insurance policies of any competitors.  Thus, the Agreement provides that the "Agency will not, either directly or indirectly, solicit, sell, or service insurance of any kind for any other company, agent, or broker, or refer a prospect to another company, agent, or broker, without the prior written approval of the Company."  (EA Agreement ¶ I.E).  This is reinforced by the Contractor Manual.  (PEx OO at 10).  For one year after termination, the Agency was prohibited from soliciting "the purchase of products or services in competition with those sold by the Company."  (EA Agreement ¶ XVIIID).  This is not a situation where a customer comes to the Agency and the Agency then shops the business with multiple insurers — which is the role of the agent under the American System.  See Arbella, 456 Mass. at 85, 921 N.E.2d at 553-54; see also note 17, infra.

While the defendants seem to deny that they were required to sell Allstate insurance exclusively, a careful reading of their pleadings establishes that the defendants have not created a disputed material fact. Thus, Fougere has attested:

> When I became an agent for Allstate, Scott Blume and others at Allstate strongly encouraged me to continue servicing and selling to all of my customers until I could either convert those customers to Allstate policies or to such a time that Allstate would start offering insurance products for them, such as homeowner products. At the time, Allstate did not have homeowner products in Massachusetts (only auto) and Allstate wanted me to keep these customers and continue placing their insurance with whatever insurance carrier I choose. The plan, as describe [sic] to me by Allstate, was that once Allstate commenced selling homeowner products in Massachusetts, Allstate wanted me to convince my clients to switch to Allstate for their homeowner insurance products.

(Docket No. 127-3 at ¶ 2). Defendants cite this in support of their contention that "defendants were not exclusive or within the American Rule." (Docket No. 137 at 19). This assertion is disputed. (See, e.g., Docket No. 152 at 12-15). Nevertheless, even the most liberal reading does not establish that the defendants were free to shop insurance that Allstate provided to other insurers.[16] At most, it states that, with Allstate's permission, Fougere was free to place non-competitive insurance with other insurers. This does not bring the defendants under the American Agency System.[17] Since the American Agency System does not apply to this case, plaintiff's motion for summary judgment on Count III of the Counterclaims is allowed.

---

[16] The circumstances under which such statements were made are not described in the affidavit. Of course, if the statements were made before the written agreement was signed, the oral terms would have been "superseded by and merged in the written contract." Canney, 353 Mass. at 165, 228 N.E.2d at 728, and cases cited. The EA Agreement expressly provides the same. (EA Agreement ¶ I.B).

[17] In describing the evolution of the American System, the Massachusetts Bankruptcy Court explained that it is now common for an insured to "leave[] the choice of insurance companies up to his agent or broker who then places any particular risk where he considers it most advantageous. The choice of insurance company is made independently by the agent based upon such considerations as the amount of commission, his need to keep a variety of companies satisfied with a diversity of risks, the difficulty in

### C.    The Defendants' Claim under Mass. Gen. Laws ch. 175, § 163

Both parties seek summary judgment as to the defendants' counterclaim under Mass. Gen. Laws ch. 175, § 163 (Count II), which provides certain insurance agents the right to 180-days notice prior to termination.  (Docket No. 22 at 28).  In addition, Allstate has moved for summary judgment on Count I of the defendants' Counterclaims in which the defendants contend that the failure of Allstate to give them the 180-days notice provided by the statute constitutes a breach of the covenant of good faith and fair dealing.  (See id. at 27).  The parties disagree as to whether § 163 provides a private right of action, whether it applies to the defendants, and whether it applies to terminations for cause.  This court concludes that while the case law on § 163 is scant, it does not apply to exclusive agents such as the defendants in the instant case.[18]  Therefore, summary judgment shall enter in favor of Allstate on Counts I and II of the Counterclaim.

"Section 163 was intended to protect or benefit *independent insurance agents* and brokers in their dealings with insurance companies."  Brooks v. Hanover Ins. Co., 23 Mass. App. Ct. 992, 993, 504 N.E.2d 1075, 1077 (1987) (emphasis added).  The statute provides, in relevant part:

> No company shall cancel the authority of any *independent insurance agent* for ... casualty insurance ... *if said agent is not an employee of said company* and no company shall modify a contract with such an agent unless the com-pany gives written notice of its intent to cancel such agent or its intent to

---

placing a particular risk, any special needs of the insured, and a variety of additional considerations personal to the agent and quite probably different for different agents."  In re Roy A. Dart Ins. Agency, 5 B.R. at 209.  In the instant case, there is nothing to support a finding that the defendants had this discretion in connection with placing insurance for customers with respect to lines of insurance offered by Allstate.

[18] In light of this ruling, this court does not reach the issue of whether notice is required in the case of termination for cause.

modify such contract at least one hundred and eighty days before the pro-
posed effective date of any such cancellation or modification.

Mass. Gen. Laws ch. 175, § 163 (emphasis added).  The statute provides further that

> Except as otherwise provided herein, any agent receiving notice of such
> cancellation, modification or expiration ***may***, within fifteen days after receipt
> thereof, make a written demand for reference to three referees of *the*
> *question as to whether or not such cancellation, modification or expiration*
> *will so affect the* renewal*, continuation or replacement of any policies placed*
> *with the company through the efforts of the agent, or the services needed by*
> *any policyholder doing business with the company as a result of the efforts of*
> *the agent, as to justify renewal or continuation of any policies then in effect*
> *having been placed with such company by such agent.*

Id. (emphasis added).  Thus, pursuant to § 163, "the referees must determine whether

cancellation of the agency relationship will have an effect on the continued policies.  If the

referees find the required effect, the affected policies must be renewed and the cancelled

agent given compensation for an additional year."  Frontier Mgmt. Co., Inc. v. Balboa Ins. Co.,

622 F. Supp. 1016, 1019 (D. Mass. 1985).

Allstate initially argued that the defendants were obligated to seek administrative

review of their claimed violation of the statute, and that § 163 did not create a private cause of

action.  (See Docket No. 131 at 26-27).  That argument, however, was rejected by the First

Circuit in Cigna Fire Underwriters Co. v. MacDonald & Johnson, Inc., 86 F.3d 1260 (1st Cir.

1996), where the Court, relying on the word "may" highlighted above, ruled that "[i]t cannot be

reasonably doubted that the statute is permissive" and that "[w]e have been unable to find any

cases in this Circuit or in Massachusetts requiring an agent to invoke Mass. Gen. L. ch. 175

§ 163 prior to asserting claims against an insurance company, and [the insurance company] has

cited none."  Id. at 1265.  Allstate does not seem to be pursuing this argument (see Docket No.

163) and this court rules that, even assuming the statute applies to them, the defendants were not obligated to seek an administrative hearing before suing for breach of ch. 175, § 163.

This court does conclude further, however, that § 163 does not apply to the defendants. As the Arbella court recognized, there are different types of insurance agents: there are "employee agents" and "exclusive agents," who are limited to one insurer, and "independent producers" who are "free to sell insurance products through more than one company." Arbella, 456 Mass. at 90, 921 N.E.2d at 557. In the instant case, and for the reasons detailed above, the defendants who, pursuant to their EA Agreements, are exclusive agents of Allstate were not permitted to sell other insurers' products in competition with Allstate. Treating exclusive agents like employee agents because they are both limited to one insurer, but differently than independent agents who are free to sell insurance products through more than one company, would make § 163 consistent with § 162F as discussed above. Compare Mass. Gen. Laws ch. 175, § 162F, which refers to agents who are "doing business pursuant to the so-called American agency system, other than that of an employer to employee relationship[,]" with § 163, which refers to "any independent insurance agent . . . if said agent is not an employee of said company[.]"

The omission of exclusive agents from the notice requirements of § 163 is also consistent with the substance of that provision. The procedures established in § 163 for an agent to challenge a termination decision and seek post-termination renewals has no application to exclusive agents, where the renewals or continuations of the policies belong to the insurance company after termination, and not to the agent. Under an exclusive arrangement, there is no reason to have a hearing or otherwise establish a procedure for determining the

agency's continued entitlement to renewals. "Were it otherwise, the insurer would, in effect, be required by law to compensate a former agent for expirations that it, not he, owns." <u>Metz</u>, 164 Md. App. at 395, 883 A.2d at 948; <u>see also</u> 3 Couch on Insurance § 44:69 (3d ed. 1995) (no notice under statute is required "when the insurer owns the agent's book of business or expirations pursuant to the terms of the contract between the insurer and the agent."). Under the Allstate EA Agreement, the agent is granted an "economic interest" in his "book of business" which he can sell to an Allstate-approved buyer. <u>See</u> <u>Metz</u>, 164 Md. App. at 402, 883 A.2d at 952. Such compensation at the termination of the Agreement is "in lieu of the benefits conferred by the notice and renewal rules. The notice and renewal rules kick-in when expirations are taken from an agent . . . and given to the insurer, not when the agent does not own them in the first place, having contractually transferred whatever ownership claim he had in them to the insurer as part of the bargain the parties had struck at the inception of their relationship." <u>Id.</u>, at 403, 883 A.2d at 953.

"Rather than 'culling selected words [or sentences] from a statute's text and inspecting them in an antiseptic laboratory setting, a court engaged in the task of statutory interpretation must examine the statute as a whole, giving due weight to design, structure, and purpose as well as to aggregate language.'" <u>Cablevision of Boston, Inc. v. Pub. Improvement Comm'n of Boston</u>, 184 F.3d 88, 101 (1st Cir. 1999) (quoting <u>O'Connell v. Shalala</u>, 79 F.3d 170, 176 (1st Cir. 1996)). For all the reasons detailed herein, this court finds that the defendants were not entitled to the 180-day notice included in Mass. Gen. Laws ch. 175, § 163 as they were exclusive agents. Therefore, summary judgment shall be entered in favor of Allstate on Counts I and II of

the Counterclaim.  The defendants' motion for summary judgment on Count II of their Counter-

claim is denied.

**D.    The Defendants' Claim under Mass. Gen. Laws ch. 93A**

In Count V of their Counterclaim, defendants contend that Allstate violated Mass. Gen.

Laws ch. 93A.  (Docket No. 22 at 29).  As described by the defendants:

> The entire manner in which Allstate has engaged defendants has been
> duplicitous and in bad faith.  From terminating defendants' agreements
> because Mr. Fougere raised valid concerns about overcharging customers
> and violations of Massachusetts insurance law to sending threatening letters
> asserting false trade secrets claims as a means to keep defendants from
> competing against Allstate.  Also the terminating of Ms. Brody-Isbill's agency
> agreement, along with other acts, as a means to retaliate against Mr.
> Fougere.

(Docket No. 137 at 20).  Allstate denies any and all wrongdoing, and argues that "there is no

evidence that Allstate did anything other than terminate Fougere's and Brody-Isbill's

Agreements, and sue Defendants for misappropriating Allstate's confidential information."

(Docket No. 152 at 16).  However, apparently recognizing that the undefined scope of the

defendants' ch. 93A claim makes moving for summary judgment on the merits difficult, Allstate

has limited its motion to an argument that it is entitled to summary judgment because the

defendants have failed to demonstrate or allege any "injury to consumers" as required by <u>Full

Spectrum Software, Inc. v. Forte Automation Sys., Inc.</u>, 858 F.3d 666, 671 (1st Cir. 2017).  (<u>See</u>

Docket No. 152 at 16).

For the reasons detailed herein, this court finds that Allstate's reading of the statute is

too limited.  Nevertheless, this court questions whether ch. 93A applies to the exclusive agency

relationship between Allstate and Fougere and Brody-Isbill; it may be considered a private

transaction and may not qualify as involving "trade or commerce."  Since this issue was not

addressed by the parties, Allstate's motion for summary judgment is denied without prejudice pending further development of the record. Moreover, nothing herein is intended to constitute a ruling on whether the allegations of wrongdoing rise to the level of an actionable unfair and deceptive act or practice in violation of ch. 93A.

As the First Circuit explained in Full Spectrum Software, on which Allstate relies:

> Chapter 93A makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A § 2. Section 11 of the statute extends its protections to business entities. Id. at §§ 9, 11. Chapter 93A does not define what constitutes an unfair or deceptive act or practice. And, though "the boundaries of what may qualify for consideration as a [chapter 93A] violation is a question of law," "whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact." Commercial Union Ins. Co. v. Seven Provinces Ins. Co., 217 F.3d 33, 39 (1st Cir. 2000) (quoting Schwanbeck v. Fed. Mogul Corp., 31 Mass. App. Ct. 390, 578 N.E.2d 789, 803-04 (1991)).
>
> To determine whether conduct is unfair, the finder of fact must assess whether the conduct "falls 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness'; 'is immoral, unethical, oppressive, or unscrupulous'; and '**causes substantial injury to consumers.**' " Walsh v. TelTech Sys., Inc., 821 F.3d 155, 160 (1st Cir. 2016) (**quoting PMP Assocs., Inc. v. Globe Newspaper Co.,** 366 Mass. 593, 321 N.E.2d 915, 917 (1975)). And to determine whether conduct is deceptive, the finder of fact must assess whether the conduct "possesses a tendency to deceive" and "could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted." Walsh v. TelTech Sys., Inc., 821 F.3d 155, 160 (1st Cir. 2016) (alteration in original) (quoting Aspinall v. Philip Morris Cos., 442 Mass. 381, 813 N.E.2d 476, 486 (2004)).

858 F.3d at 671–72 (emphasis added). While the entire quote from PMP Associates was not included by the First Circuit in its description of 93A, a review of the case establishes that the injury does not need to be limited to consumers, but can also include "competitors or other businessmen." See PMP Assocs., 366 Mass. at 596, 321 N.E.2d at 918 (conduct is not actionable where it "is not within any recognized conception of unfairness, is neither immoral, unethical,

oppressive nor unscrupulous, and would not cause substantial injury to consumers, competitors

or other businessmen.").  The defendants have alleged conduct on the part of Allstate that

caused them harm as competitors and businessmen, and affected their ability to sell products

to the public.  Based on these allegations, this court cannot rule that, as a matter of law, the

defendants are unable to state a claim under ch. 93A because of the type of harm alleged.

A more difficult question, which the parties have not addressed, is whether chapter 93A

applies to the EA Agreements between the parties.  Chapter 93A prohibits "unfair or deceptive

acts or practices in the conduct of any trade or commerce[.]"  Mass. Gen. Laws ch. 93A, § 2.

The statute is designed to "encourage more equitable behavior in the marketplace[,]" and its

protections apply not only to consumers but also "persons engaged in trade or commerce in

business transactions with other persons also engaged in trade or commerce."  Manning v.

Zuckerman, 388 Mass. 8, 12, 444 N.E.2d 1262, 1264-65 (1983).  However, the "trade or

commerce" requirement has been interpreted to exclude purely private transactions, including

"internal employment or intra-enterprise disputes."  Weiler v. PorfolioScope, Inc., 469 Mass.

75, 92-93, 12 N.E.3d 354, 369 (2014), and cases cited.  Thus, 93A does not apply to someone

seeking to sue his or her business partner, or a suit by an employee against his or her employer.

See, e.g., Debnam v. FedEx Home Delivery, 766 F.3d 93, 96-97 (1st Cir. 2014) (citing, inter alia,

Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 23 & n.33, 679 N.E.2d 191 (1997)).

There is case law support for the conclusion that ch. 93A does not apply where, as here,

the defendants have an exclusive arrangement with Allstate.  Thus, ch. 93A was held not to

apply to a situation whereby the plaintiff provided delivery services to just one customer,

FedEx, and not to the general public: the result was the same regardless of whether the plaintiff

was an employee or independent contractor of FedEx.  Debnam, 766 F.3d at 97-98.  In Benoit v.

Landry, Lyons & Whyte Co., Inc., 31 Mass. App. Ct. 948, 580 N.E.2d 1053 (1991) (rescript), the

plaintiff was a licensed real estate salesman who was prohibited by statute "from operating his

own real estate business and from receiving payment for his services from anyone except the

single broker with whom he or she is affiliated."  Id. at 949, 580 N.E.2d 1054.  Despite the fact

that the plaintiff was an independent contractor, 93A did not apply.  Id.; see also Whitman &

Co., Inc. v. Longview Partners (Guernsey) Ltd., No. 14-cv-12047-ADB, 2015 WL 4467064, at *11

(D. Mass. July 20, 2015) (motion to dismiss ch. 93A claim brought by exclusive marketing agent

denied where there was nothing in the parties' Exclusive Agency Agreement that prevented the

plaintiff "from providing its services to anyone else").

Consistent with these cases, it appears to this court that ch. 93A may not be available to

Fougere or Brody-Isbill, pursuant to their EA Agreements.  However, the issue was not

addressed by the parties in these terms.  Consequently, Allstate's motion for summary

judgment on Count V of the Counterclaim will be denied without prejudice.

### V.  ANALYSIS –
### PLAINTIFF'S CLAIMS

### A.  Breach of Contract by Misappropriation of Confidential Information

Allstate contends that the defendants misappropriated the Company's confidential

information focusing, without limitation, on two spreadsheets entitled TU Framingham and TU

Auburn.[19]  (See PExs. II, KK, MM, NN).  It is undisputed that these spreadsheets, which were

---

[19] It is undisputed that "TU" stands for Thumbs Up Marketing, Inc., the name of the company established on August 29, 2014 by Fougere.  (PF ¶¶ 79-80).  As detailed above, Fougere had operated an Allstate office in Framingham (PF ¶ 20), while Brody-Isbill had operated an Allstate office in Auburn.  (PF ¶ 38).

found on ABIA's computer after a court-ordered forensic search (see Docket Nos. 30, 46, 56, 62), "each contain the names of thousands of Allstate customers, along with their renewal dates, premiums, types of insurance, Allstate policy numbers, drivers' license numbers, home addresses, phone numbers, and email addresses."  (PF ¶ 103).[20]  A screenshot of the TU Framingham list shows the names of 35 Allstate customers, 34 of whom, according to Allstate, "appear in the list of customers assigned to Foguere's agency as of its termination."  (PF ¶¶ 99-100).[21]  Similarly, of the 29 customers listed in a screenshot of the TU Auburn spreadsheet, Allstate contends that 22 were formally assigned to Brody-Isbill's Allstate agency.  (PF ¶ 101).  Allstate contends that its "confidential information is not just the lists in and of themselves, but the customer information contained *in* those lists."  (Docket No. 142 at 11 (emphasis in original); PR ¶ 25).

In Counts I and V of its Complaint, Allstate contends that "Fougere and Brody-Isbill [respectively] breached their EA Agreements by retaining Allstate confidential information after the termination of their EA Agreements, using that confidential information to compete against Allstate, and disclosing that confidential information to parties not authorized to receive it[,]" including employees of ABIA.  (Docket No. 131 at 20-21).  Both parties have moved for sum-

---

[20] The defendants have admitted these facts, except that they deny that all the persons on the list are current customers of Allstate.  (DR ¶ 103).

[21] While the defendants raise questions about the way Allstate conducted its audit of the TU Framingham and Auburn spreadsheets to determine if they contained customers who had been affiliated with the defendants' Allstate offices, they do not challenge Allstate's ultimate conclusions as to the overlap.  (See DR ¶¶ 100, 101).  They should have been able to challenge Allstate's analyses if they were inaccurate, since information regarding whether the customers on the spreadsheets had been previously assigned to the Allstate offices of Fougere or Brody-Isbill would have been in the defendants' knowledge.

mary judgment on these Counts.  It is the defendants' contention that the information con-

tained in the spreadsheets belonged to them, was publicly available, and does not constitute

confidential information as a matter of law.  (See Docket No. 137 at 3-6; Docket No. 127 at 44-

45).  As evidence of these contentions, the defendants rely on the (undisputed) fact that

Allstate never reported their alleged misuse of confidential information as data breaches to

federal or Massachusetts authorities pursuant to Mass. Gen. Laws ch. 93H, §§ 1-6, ch. 93A, § 4,

and 201 CMR 17.00 et seq.  (Docket No. 127 at 34-36).[22]  The defendants further contend that

Allstate has failed to establish any damages arising out of the alleged breach.  (Id. at 32-33).  For

the reasons detailed herein, Allstate's motion for summary judgment on Counts I and V is

allowed as to liability only.  The defendants' motion for summary judgment on these Counts is

denied.

### The Disputed Facts Are Not Material

As an initial matter, Fougere contends that he "purchased and acquired the information

from third parties, such as lead generators, RMV, Lexis/Nexis, car dealerships, and real estate

agents, and compiled the list with his own monies and resources" before, during and after his

relationship with Allstate.  (See Docket No. 137 at 3; DF ¶ 9; Docket No. 127 at 10).  Allstate

argues that, despite repeated requests, the defendants have failed to provide any credible

proof of such purchases.  (See Docket No. 152 at 5-6; Docket No. 142 at 10; Docket No. 160 at

6-8).  Allstate further disputes that the information could be obtained from readily available

sources, and, in fact, contends that "Fougere's purported use of the RMV as a source of

---

[22] Defendants also cite to the Gramm-Leach Bliley Act and its requirement that certain financial institu-
tions and insurers institute information security programs.  (Docket No. 127 at 35-36).  The defendants
do not explain the relevance of this Act to the instant dispute, and it will not be discussed further.

marketing leads would be illegal." (Docket No. 142 at 12). These disputed facts are not necessary to the instant summary judgment analysis. For purposes of these motions, this court will assume that Fougere created these spreadsheets at least partially while an agent for Allstate, as he has admitted, and that the spreadsheets contain at least some information that he purchased.

The defendants also challenge the veracity of the statements put forth by former employees of ABIA about their use of the information contained in the spreadsheets. (See PF ¶¶ 94-98; DR ¶¶ 94-98). Allstate contends that the defendants have not credibly challenged this information. (Docket No. 160 at 8-11). This issue does not need to be resolved here either, since the scope of the defendants' use of the confidential information will be left for the damages trial.

## Terms of the Exclusive Agency Agreement

The EA Agreements expressly define confidential information as follows:

> IV.D. Confidential information includes, but is not limited to: business plans of the Company; information regarding the names, addresses, and ages of policyholders of the Company; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by the Company as confidential or information considered a trade secret as provided herein or by law; *and any information concerning any matters affecting or relating to the pursuits of the Company that is not otherwise lawfully available to the public.* All such confidential information is wholly owned by the Company. Such confidential information may be used by Agency only for the purposes of carrying out the provisions of this Agreement.
>
> E. Any confidential information or trade secrets recorded on paper, electronic data file, or any other medium, whether provided by the

Company or by Agency, is the exclusive property of the Company, as is any such medium and any copy of such medium.

F. Agency recognizes that a breach of the foregoing provisions will cause irreparable damage to the Company's business and that such damage is difficult or impossible to measure. Agency agrees that in the event of such breach, the Company, in addition to such other rights and remedies it may have, will be immediately entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and Agency waives any defense to an application for such order, except that the violation did not occur. Agency agrees that the Company will be entitled to an award of reasonable attorneys' fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

(EA Agreement (emphasis added)).

There is no question that the information in the TU Framingham and TU Auburn lists are the types of information that are specifically listed as being "confidential" in the EA Agreements. The defendants seek to avoid this conclusion by arguing that the information cannot be deemed confidential to the extent that it is "otherwise lawfully available to the public" as referred to in the Agreements, and that, as a result, information such as names and addresses of individuals cannot be confidential. Such an interpretation distorts the clear meaning of the contract and is nonsensical. First of all, the contract must be read as a whole — "[i]ts meaning cannot be delineated by isolating words and interpreting them as though they stood alone." Doe v. Trs. of Boston Coll., 892 F.3d 67, 81 (1st Cir. 2018) (internal punctuation and citation omitted). Moreover, the phrase "otherwise lawfully available to the public" relates to and limits the catch-all phrase declaring confidential "any information concerning any matters affecting or relating to the pursuits of the Company[.]" It does not limit the confidentiality of the other specified types of information. See Lifespan Corp. v. N.E. Med. Ctr., Inc., No. 06-cv-

421-JNL, 2011 WL 2134286, at *8 (D.R.I. May 24, 2011) (the "general rule of grammatical construction" is that "a modifying clause is confined to the last antecedent unless there is something in the subject matter or dominant purpose which requires a different interpretation") (quoting Deerskin Trading Post, Inc. v. Spencer Press, Inc., 398 Mass. 118, 123, 495 N.E.2d 303, 307 (1986)).

As detailed more fully above, Allstate's list of data that it deems confidential "is consistent with the meaning of 'insurance expirations'" and constitutes information that "is vital for soliciting renewals." Arbella, 456 Mass. at 88-89 & n.31, 921 N.E.2d at 555-56 & n.31; see also Metz, 164 Md. App. at 398, 883 A.2d at 950 (interpreting Allstate EA). Such expirations are valued in the industry. See In re Roger G. Gibson, 2017 WL 7795950, at *5. Anyone having all the information about customers or potential customers contained in the spreadsheets would be at a competitive advantage. See Optos, Inc. v. Topcon Med. Sys., Inc., 777 F. Supp. 2d 217, 238-39 (D. Mass. 2011) (comprehensive list of names and addresses of customers which would be time consuming to create, along with additional information about services provided to customers, qualifies for trade secret protection — the parties agreed that a rival business "that lacked the detailed information contained in the list would be at a competitive disadvantage"). The fact that some of the information can be obtained from public sources does not prevent a business from requiring that it be kept confidential where, as here, the compilation itself would be difficult. Id. at 239 (difficulty in gathering information one zip code at a time favors it being considered a trade secret); see also Bruno Int'l Ltd. v. Vicor Corp., No. 14-10037-DPW, 2015 WL 5447652, at *12 (D. Mass. Sept. 16, 2015) ("customer lists and pricing information . . . can constitute trade secrets where the information provides its holder with a competitive

advantage."); CPI Card Group-Colorado, Inc. v. Lehouck, No. 14-13434-NMG, 2014 WL 5025356, at *6 (D. Mass. Oct. 8, 2014) (fact that some customer information could be found publicly did not destroy trade secret status of customer information).  Thus, "[a] customer list can be a trade secret when it is the end result of culling the relevant information from lengthy and diverse sources, even if the original sources are publicly available."  Hertz v. Luzenac Group, 576 F.3d 1103, 1114-15 (10th Cir. 2009).  Under such circumstances, the EA Agreements' confidentiality provisions are enforceable.  See J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 357 Mass. 728, 736, 260 N.E.2d 723, 729 (1970) (a trade secret may consist of a "compilation of information," including "a list of customers" where the information gives the owner "an opportunity to obtain an advantage over competitors who do not know or use" the information) (quoting Restatement of Torts § 757, comment (b))).

The defendants' contention that the confidentiality requirements of the contract do not apply because they created the spreadsheets and gathered the information contained therein is unavailing.  Assuming these facts to be true, there is nothing in the EA Agreement which indicates in any way that confidential information is limited to information compiled by Allstate instead of the Agency, and such an interpretation would be in conflict with the entire Agree-ment, which provides for Allstate's ownership of the confidential information.  In fact, the EA Agreement recognizes both that the Agency is to "build and maintain a profitable book of business" and that the "Company will own all business produced under the terms of this Agreement."  (EA Agreement ¶¶ II.B, I.A).  Moreover, the EA Agreement provides that "confidential information or trade secrets recorded on paper, electronic data file, or any other medium, whether provided by the Company or the Agency, is the exclusive property of the

Company[.]"  (Id. ¶ IV.E (emphasis added)).  The spreadsheet information at issue here was clearly part of an electronic data file.  The information contained in the spreadsheets belonged to Allstate.[23]

The defendants contend that Allstate failed to keep the information confidential, and challenge Allstate's allegations that its Exclusive Agents are given training in the need to keep the "confidential information" described in the EA Agreement confidential.  (See DR ¶¶ 5-6).  Nevertheless, it is undisputed that Fougere and Brody-Isbill signed their EA Agreements, which define confidential information, require that it be kept confidential and require that it be returned upon the conclusion of the Agreements.  (See, e.g., EA Agreement ¶¶ IV.B-E, XVIII.B, D).  The EA Agreements they signed further acknowledge the importance of the confidential information to Allstate, and that the failure to abide by the confidentiality agreements, among other provisions, will cause Allstate irreparable harm.  (Id. ¶¶ IV.F; VIII.F-G).  As detailed above, the EA Agreements establish that the confidential information (i.e., the expirations) belong to Allstate.  As defendants have acknowledged, Allstate has sued to enforce the confidentiality provisions in the EA Agreement and has prevailed.  (See Docket No. 127 at 33-36).[24]  See Allstate Ins. Co. v. Rote, No. 3:16-cv-01432-HZ, 2016 WL 4191015, at *7 (D. Or. Aug. 7, 2016) (former Exclusive Agent "ordered to return all Allstate information and property in her custody, possession or control," including information described as confidential in the EA Agreement).

---

[23] Fourgere contends that the data file was not on any Allstate computer, but is silent as to how the information got onto ABIA's computer, information that would clearly be in his possession.  In any event, the information contained in the spreadsheets clearly relates to Allstate's customers.

[24] The fact that the defendants may think that the suits were baseless does not negate the fact that Allstate has taken steps to enforce its agreements and to ensure that the information it deems confidential is kept confidential.

Allstate maintained an online electronic records portal for its Agents, and could control their access.  (PF ¶¶ 69-70, 76-77).  The defendants' access was ended by Allstate when their Agreements were terminated.  (Id.).

Allstate has met its burden of proving that it kept its confidential information confidential.  See Allstate Life Ins. Co. v. Stillwell, Civ. No. 15-8251, 2019 WL 2743697, at *10 (D.N.J. May 16, 2019) (unpub. op.) (summary judgment entered in favor of Allstate on claim for misappropriation of trade secrets by former Exclusive Financial Specialists who terminated agreement and went to work for a competitor: Allstate's "collection of client names, addresses, and telephone numbers constituted a trade secret" and Allstate took "reasonable measures to maintain the secrecy of client data" by requiring "its personnel to agree to maintain the confidentiality of this information, [limiting] the disclosure of the data to those who need it, and [educating] personnel on the issue.").

The defendants' argument that the fact that Allstate has not reported a data breach to state or federal authorities establishes that the information is not confidential is without merit.  As an initial matter, it is unclear whether the defendants are requesting that Allstate report them to authorities for prosecution, which would be an unusual request.  See Katz v. Pershing, LLC, 806 F. Supp. 2d 452, 458 (D. Mass. 2011) ("the power to enforce Chapter 93H is limited to the State Attorney General – the statute does not incorporate or otherwise authorize a private right of action."), aff'd on other grounds, 672 F.3d 64 (1st Cir. 2012).  In any event, charging the defendants with misappropriation of confidential information in and of itself is not the equivalent of charging them with the unauthorized acquisition or use of data "that creates a substantial risk of identity theft or fraud against a resident of the commonwealth."  Mass. Gen. Laws

ch. 93H, § 1(a).  Defendants have cited to no cases, and none have been found, that require a party to charge another with engaging in a security breach before enforcing a contractual confidentiality agreement.

Finally, the defendants' argument that Allstate has failed to establish any damages is without merit.  As an initial matter, as the EA Agreements provide, the defendants have acknowledged that disclosure of its confidential information will cause Allstate irreparable harm.  "A threat of future harm is presumed when a plaintiff successfully demonstrates a likelihood of success on the merits of a claim for trade secret misappropriation[,]" especially "where, as here, the trade secrets are misappropriated by a direct competitor."  Ooyala, Inc. v. Dominguez, No. 17-10943-GAO, 2018 WL 3360759, at *7 (D. Mass. July 10, 2018), and cases cited.  Moreover, it is recognized in the industry that expirations have financial value, whether they are exclusive or non-exclusive.  In re Roger G. Gibson, 2017 WL 7795950, at *5.  Finally, as Allstate has explained, when Exclusive Agents elect not to sell the economic value in their book of business, Allstate can cede those customer accounts to other Exclusive Agents "as an incentive for strong sales, to entice new agents to join Allstate, and perhaps most importantly, can cede that information to other agents to have them service the customer."  (Docket No. 142 at 13-14).  Allstate has established that it has been harmed by the defendants' breach of contract.  The extent of that harm will have to be decided at trial.

For these reasons, summary judgment shall enter in favor of Allstate on Counts I and V of its Complaint as to liability only.  The defendants' motion for summary judgment as to these Counts are denied.

B.  **Allstate's Trade Secret Claims**

Allstate has alleged that defendants Fougere and Brody-Isbill misappropriated Allstate's trade secrets in violation of Massachusetts common law (Counts II and VI) and that Fougere, Brody-Isbill and ABIA misappropriated Allstate's trade secrets in violation of the Defend Trade Secrets Act of 2016, 18 U.S.C.§ 1839 et seq. ("DTSA").  (Counts III, VII & IX).  As noted above, for purposes of the motion for summary judgment, the parties have focused on the customer information contained in the TU Framingham and TU Auburn spreadsheets.  All parties have moved for summary judgment on these claims.

To prevail on its common law misappropriation claims, Allstate "must show the existence of a trade secret; that it took reasonable steps to preserve its secrecy; and that defendants used improper means, in breach of a confidential relationship, to acquire and use the trade secret."  Repat, Inc. v. IndieWhip, LLC, 281 F. Supp. 3d 221, 227 (D. Mass. 2017), and cases cited; see also Incase Inc. v. Timex Corp., 488 F.3d 46, 52 (1st Cir. 2007).  "The standard for misappropriation under the DTSA is substantially similar to that under Massachusetts law." Viken Detection Corp. v. Videray Techs. Inc., 384 F. Supp. 3d 168, 177 (D. Mass. 2019).  As the court explained in Allscripts Healthcare, LLC v. DR/Decision Res., LLC, 386 F. Supp. 3d 89 (D. Mass. 2019):

> The DTSA confers a federal cause of action on an owner of a trade secret that  has been misappropriated, so long as the trade secret owner has 1) taken reasonable measures to keep such information secret and 2) the information derives independent economic value. See 18 U.S.C. §§ 1836(b)(1) and 1839(3).  The DTSA then defines "misappropriation" as the
>
>> disclosure or use of a trade secret of another without express or implied consent by a person who ... at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret

> was ... acquired under circumstances giving rise to a duty to main-
> tain the secrecy of the trade secret or limit the use of the trade
> secret.

>    Id. at § 1839(5)(B).

386 F. Supp. 3d at 94. For the reasons detailed herein, this court finds that Allstate is entitled to

summary judgment as to liability on these Counts, and that the defendants' motion for

summary judgment should be denied.

## **Existence of a Trade Secret**

For many of the reasons discussed above, the confidential customer information

included in the spreadsheets qualify as trade secrets. "A trade secret may consist of any

formula, pattern, device or compilation of information which is used in one's business, and

which gives him an opportunity to obtain an advantage over competitors who do not know or

use it." J.T. Healy & Son, Inc., 357 Mass. at 736, 260 N.E.2d at 729 (quoting Restatement of

Torts § 757, comment b). Customer lists are expressly recognized as being a type of compila-

tion of information that can qualify as a trade secret. Id. "[W]hether the information sought to

be protected is, in fact and in law, confidential . . . depends on the conduct of the parties and

the nature of the information." Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840, 282

N.E.2d 921, 925 (1972). "Although no general and invariable rule can be laid down[,]" the

courts generally consider the six factors of relevant inquiry set forth in the Restatement of

Torts, § 757, comment b. Id. (internal quotation omitted). These are:

> (1) the extent to which the information is known outside of the business;
> (2) the extent to which it is known by employees and others involved in the
> business; (3) the extent of measures taken by the employer to guard the
> secrecy of the information; (4) the value of the information to the employer
> and to his competitors; (5) the amount of effort or money expended by the

employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Id.; see also Optos, Inc., 777 F. Supp. 2d at 238-39.

The defendants argue that the TU Framingham and TU Auburn lists were not created by, and do not belong to, Allstate. They argue that Allstate does not know how the lists were created, did not know about their existence until shortly before suit was filed, and that the lists were created by Fougere from publicly available information. They further argue that they understood that the information was theirs to use following the termination of their Agreements with Allstate. None of these (disputed) facts defeat the status of the spreadsheets as trade secrets.

As detailed above, the information contained in the spreadsheets constitutes confidential information belonging to Allstate, regardless of whether it was compiled by Allstate or the Exclusive Agent.[25] The EA Agreement itself contemplated that the Agent would develop business and customer leads for the benefit of Allstate and that Allstate would own the business. At the termination of the Agreement, the Agency, having developed a book of business, could sell its economic interest in the business to an approved buyer. (EA Agreement ¶ XVI.B). Thus, even if Fougere or ABIA paid for some of the information contained in the spreadsheets, that "fact" would be consistent with the terms of the EA Agreement, and does not alter the conclusion that the information belongs to Allstate.

---

[25] The defendants argue that Allstate cannot maintain an action under the DTSA because it does not own the trade secrets. See Hawkins v. Fishbeck, 301 F. Supp. 3d 650, 657 (W.D. Va. 2017) (action under the Defend Trade Secrets Act must be brought by the owner of the trade secret). For the reasons detailed above, this court finds that Allstate does own the confidential information.

While some of the information in the spreadsheets may be known outside of the business, or could be obtained from publicly available information (factors 1 & 6), there is no question that the compilation of customers, addresses, premium rates, renewal dates and the like are not readily available to the public. The defendants do not contend that the spreadsheet information could be acquired from a single source. As detailed above, the fact that compiling the information, even from public sources, would be difficult and time-consuming weighs in favor of a finding of trade secret status. See Optos, Inc., 777 F. Supp.2d at 238-39.

To the extent that the information is known by employees of the business and others involved in the business (factor 2), the EA Agreement requires that they keep such information confidential. As detailed in the Agreement:

> Agency agrees that it will not disclose or grant access to any confidential information or trade secrets to any of its employees or other persons providing services for it in connection with this Agreement, unless such employee or other person has signed a copy of the Confidentiality and Non-Competition Agreement, attached as Appendix A if Key Person and Appendix B if other than Key Person. Appendix B is a sample copy of the electronic version of the document that must be transmitted to the Company.

(EA Agreement ¶ IV.C). Thus, this factor also weights in favor of finding that the customer information constitutes a trade secret.

As detailed above, Allstate has taken sufficient measures to guard the secrecy of the information so as to maintain its status as confidential or trade secret (factor 3). In evaluating the adequacy of the steps taken by a company to preserve its secrets, courts consider "1) the existence or absence of a confidentiality agreement, 2) the nature and extent of precautions taken, 3) the circumstances under which the information was disclosed and 4) the degree to which the information has been placed in the public domain or rendered readily ascertainable."

<u>Optos, Inc.</u>, 777 F. Supp. 2d at 239-40 (citation omitted).  The standard is one of reasonable-ness, not perfection, and a company is not required to take "heroic" steps to preserve the secrecy of its trade secrets.  <u>Id.</u> at 240.  While the defendants deny having participated in the training about confidentiality that Allstate contends it required of all Exclusive Agents, the defendants did sign the EA Agreement with its repeated references to confidentiality, and did sign confidentiality agreements.  Allstate used an electronic records portal to maintain its customer information, and upon the defendants' termination, their access to this system was revoked.  (<u>See</u> DR ¶¶ 69-70, 76-77).  As detailed above, this is reasonably sufficient to protect Allstate's trade secrets.  <u>See</u> <u>Allstate Life Ins. Co. v. Stillwell</u>, 2019 WL 2743697, at *10.

There can be little doubt that the information was valuable to Allstate and its competi-tors (factor 4).  As detailed above, expirations are "vital" to the renewal business of insurance companies.  There is also evidence that knowing the expiration date of insurance helps sales since people are more likely to change providers around the time that they are renewing their policies.  (PF ¶ 89).  The EA Agreement provides that breaching the confidentiality provisions will cause Allstate irreparable harm.  Moreover, there is evidence that the expirations have financial value, either in connection with a transfer by the Agency upon termination of the Agreement or the retention of such information by Allstate.  As detailed more fully above, the defendants' argument that Allstate suffered no damages as a result of the breach of the confidentiality provisions of the EA Agreement is without merit.  Moreover, there can be little question that the information would be of value to competitors, since competitors would have the information necessary to undercut Allstate, including contact information, information about the insurance needs of the customer, and the price the customer was paying.  The value

of the information to Allstate, and the value it would have if disclosed to competitors, further support the conclusion that the spreadsheets constituted trade secrets.

The final factor, the amount of effort or money expended by the employer in developing the information (factor 5) is disputed. The defendants contend that they expended consider- able funds in purchasing the information. As an initial matter, the evidence in support of this assertion is not persuasive. However, this court will not assess credibility in connection with these summary judgment motions. It is undisputed that Fourgere and Brody-Isbill were paid by Allstate under their EA Agreements. Part of their duties was to develop a customer base for Allstate. Thus, it cannot be said that Allstate did not expend funds in developing the information.[26]

In sum, after considering all relevant factors, this court concludes that the information contained in the spreadsheets constitute trade secrets, and that Allstate took reasonable steps to secure the confidentiality of its customer information.

### Improper Means

The next inquiry is whether the trade secrets were acquired by improper means. "As a matter of law, an individual who breaches contractual duties to obtain trade secrets has used improper means." Optos, Inc., 777 F. Supp. 2d at 240, and cases cited. As detailed above, Fougere and Brody-Isbill's retention of this information and its use after the termination of their EA Agreements was in violation of their contractual duties and was therefore improper. The fact that Brody-Isbill claims that she never read the contract is of no avail. See Canney, 353

---

[26] Allstate contends, without record citation, that it paid Fougere and Brody-Isbill "hundreds of thousands of dollars in commissions to develop this information for Allstate." (See Docket No. 152 at 9).

Mass. at 165, 228 N.E.2d at 728. Similarly, her subjective understanding that the information belonged to her is irrelevant. Whatever the defendants' "hopes and expectations," they are "not entitled to insist that the [EA Agreement] be tortured into something totally different from what it says." ITT Corp. v. LTX Corp., 926 F.2d 1258, 1263 (1st Cir. 1991). "[C]ontracting parties are bound by objective manifestations and expressions, not subjective expectations." Id. (quoting Pahlavi v. Palandjian, 809 F.2d 938, 945 (1st Cir 1987)). ABIA is also liable for these individual defendants' breaches. "A party who knowingly benefits from the breacher's trade secret bounty is also liable." Optos, Inc., 777 F. Supp. 2d at 240.

The defendants also contend that there is no evidence that Brody-Isbill ever used the misappropriated information or engaged in the acquisition of such information by ABIA. (See Docket No. 147 at 7). These allegations are disputed, and Allstate points to the fact that the Auburn list was composed almost exclusively of her clients and that the former ABIA employees have testified that she was present when Fougere made statements about his Allstate scheme. These discrepancies do not need to be resolved at this time. The scope of Brody-Isbill's involvement in any misappropriation will be explored further at the trial of damages.

For all these reasons, Allstate is entitled to summary judgment as to liability only on Counts II, III, VI, VII and IX of its Amended Complaint. The defendants' motion for summary judgment (and related requests for attorneys' fees) as to these Counts is denied.

### VI. CONCLUSION

For the reasons detailed herein, this court rules as follows:

1.       Defendants' motion to strike (Docket No. 150) is ALLOWED, defendants' motion to disqualify (Docket No. 151) is DENIED and plaintiff's motion for sanctions (Docket No. 161) is

DENIED.  In addition, the court will not consider the email purportedly obtained from counsel for the Massachusetts Division of Insurance and related arguments.

2.      With respect to the Counterclaim, neither Mass. Gen. Laws ch. 175, § 163 nor ch. 175, § 162F apply to the defendants as Exclusive Agents of Allstate, so Allstate's motion for summary judgment is ALLOWED on Counts I, II and III of the Counterclaim, and defendants' motion for summary judgment on Count II of the Counterclaim is DENIED.

The court finds further that it is questionable that Mass. Gen. Laws ch. 93A applies to the parties' contractual arrangement, but for reasons different than those argued by the parties.  Therefore, the plaintiff's motion for summary judgment on Count V of the Counter-claim is DENIED WITHOUT PREJUDICE.  The court will allow the plaintiff to move for summary judgment on this claim again, if it believes it to be warranted.

3.      With respect to Allstate's claims, this court finds that the TU Framingham and TU Auburn spreadsheets, and the information contained therein, are confidential and trade secret information belonging to Allstate.  This court finds further that Fougere and Brody-Isbill breached their contract by failing to return this information to Allstate, and by using this infor-mation at ABIA, and misappropriated Allstate's trade secrets for the same reasons.  However, the extent of such use after the termination of the EA Agreements and the extent of damages, if any, are in dispute.  Therefore, Allstate's motion for summary judgment as to Counts I, II, III, V, VI, VII, and IX is ALLOWED AS TO LIABILITY ONLY, and the defendants' cross-motion as to those Counts is DENIED.  This ruling is limited to the TU Framingham and TU Auburn spreadsheets and the information contained therein.

/ s / Judith Gail Dein
Judith Gail Dein

[51]

United States Magistrate Judge